## Jacob Jennings v. The People.

Under the statute (§5811 of Comp. L.) which provides that " the lawful existence of any bank out of this state shall be presumed upon evidence that such bank is actually engaged in the business of a bank, " evidence of general reputation in the community of the existence of a bank in another state, and that its bills pass current from hand to hand in the business transactions of the day, is admissible as tending to show that there was *de facto* a bank " engaged in the business of a bank."

Such evidence being admissible, its weight is for the jury ; and it is not error for a court to charge that, if the jury are satisfied from such testimony that there was such a bank, it would be sufficient evidence to establish that fact.

*Heard April 4th. Decided April 18th.*

Error to the Recorder's Court of Detroit.

The defendant was charged, by information, with having, on the first day of March, 1860, at the city of Detroit, uttered and passed as true, to one Arthur Gore, a certain false, forged, and counterfeit bank bill, of the denomination of two dollars, payable to the bearer thereof on demand, purporting to be issued by the Agricultural Bank, an incorporated banking company in the state of Illinois, and engaged in the business of a bank in that state, with intent, &c.

On the trial, the prosecution having proved the utter-
ing of the bill, called David Preston, a banker of Detroit,
who testified that he had knowledge of the difference in
the appearance of true and counterfeit bills on said bank,
and that the bill in question was counterfeit: that he was
not acquainted with the signatures of the president or
cashier of said bank: that he had frequently seen bills
purporting to be issued by such bank, and that they
were received as money in the commercial transactions of
the state: that he did not know there was any such bank
beyond the mere knowledge which he had that its bills
were in general circulation and received as current, and
from information received from correspondents in Chicago:
that the witness was in the habit of receiving and pay-
ing out the bills of that bank. Albert Ives, a teller in
a bank in Detroit, also testified that bills of the bank in
question were current, and received in the daily transac-
tions of business.

The Recorder was requested by defendant's counsel to
charge the jury, that unless there was evidence to show
the actual existence of said Agricultural Bank, or that
said bank was actually engaged in the business of a bank,
at about the time of the alleged uttering by the prisoner,
they must acquit him. The Recorder declined this request,
but charged among other things, that in order to convict
the prisoner the jury must be satisfied from the testimony
that the said Agricultural Bank was in existence, and doing
business as a bank, and that the bill in question was a
counterfeit on said bank, and that the prisoner knowing
it to be such, had passed it intending to defraud. But
that general reputation in the community of its existence,
and the fact that its bills are passing current from hand
to hand in the business transactions of the day, were suf-
ficient evidence of the existence of the bank for the con-
sideration of the jury, and if they were satisfied from such
evidence that there was such a bank, it would be suf-

ficient evidence to establish that fact. To this charge exception was taken, and the prisoner, having been convicted, brought the case to this court by writ of error.

*W. Jennison, Jr.*, for plaintiff in error:

The prosecutor having undertaken to describe the bill in a material point, must prove it; and even had he not done so, some proof would have been required to show the legal issuing of the notes:— 6 *Yerg.* 346 ; 5 *Cush.* 606 ; 2 *Russ. on Cr.* 688 ; 1 *Greenl. Ev.* § 65. The incorporation of a bank gives value to its notes. It is that which makes them bank notes; without it, they would be worthless. Were no such bank in existence, the passing of bills purporting to be issued by it would involve no criminality under our statutes. In every point of view, the allegation was a material one. The legality of a reputed bank can not be presumed by the court in a civil case : *a fortiori* in a criminal case :— 12 *Ohio*, 150 ; 15 *Wend.* 314.

The information charges defendant with uttering a counterfeit bill, purporting |to be issued by an incorporated bank in Illinois engaged in the business of a bank in said state. The only proof of the existence of the bank was, that the bills circulated in the state, and were reputed to be issued by the Agricultural Bank. We contend, therefore, that upon general principles of law, as well as under the statutes of Michigan, there was no legal evidence of the existence of the Agricultural Bank :—2 *Greenl· Ev.* § 113 ; *Thatcher's C. C.* 67 ; 2 *Pick.* 47 ; 5 *N. H.* 367 ; 5 *Mich.* 244 ; 5 *Cush.* 606 ; 6 *Yerg.* 345 ; 21 *Wend.* 312 ; 25 *Wend.* 472 ; 1 *Spencer*, 401 ; 12 *Wend.* 547 ; 1 *Park. Cr. R.* 469 ; 2 *Ibid.* 163 ; 2 *Brev.* 1 ; 3 *Brev.* 507 ; 2 *Hawk.* 248 ; 3 *Ibid.* 393 ; 1 *British Cr. Cas.* 64, 71 ; 2 *Ibid.* 130.

*D. E. Harbaugh, Prosecuting Attorney of Wayne County*, for the people, cited :

*People v. Davis*, 21 *Wend.* 309 ; *People v. Chadwick*, 2

*Park. Cr. R.* 163; *People v. Caryl,* 12 *Wend.* 547; *John-son v. People,* 4 *Denio,* 364; *Sasser v. State,* 13 *Ohio,* 453; *Reed v. State,* 15 *Ohio,* 217.

CHRISTIANCY J.:

The information charges the prisoner with uttering and passing as true, a counterfeit bank bill, purporting to have been issued "by the Agricultural Bank, an incorporated banking company in the State of Illinois," with intent to injure the person to whom the bill was passed. The only section of the statute creating or defining the offense is section six, chapter 182 of Compiled Laws, p. 1526. This section, by its reference to section four of the same chapter, has the effect to incorporate section four, so far as respects the description of the bill and of the bank. This section four is in the following words: "Every person who shall falsely make, utter, forge or counterfeit any bank bill or promissory note, payable to the bearer thereof, or to the order of any person, *issued* by any incorporated banking company in this state, or in any of the British Provinces of North America, or in any other state or country, or payable therein at the office of any banking company incorporated by any law of the United States or of any other state, with intent to injure or defraud any person, shall be punished," &c. It is obvious that the words, "*issued* by any incorporated banking company," when applied to the charge for uttering and passing, under the sixth section, can not be taken literally, without confining the operation of the section to cases in which the bills have been made counterfeit by alteration from the genuine; since, if actually "*issued*" by the bank, they must, in all other cases, be genuine; yet it is clear that the sixth section was intended to be as broad as the fourth, which expressly extends to falsely making and forging. This apparent want of logical accuracy arises from grouping together in the same sentence, in the sixth sec-

tion, the case of altering a genuine bill with that of the false making or forging. The phrase "issued by," &c., when applied to the offense of uttering and passing, must, then, either be construed as equivalent to the words, "purporting to be issued," &c., or "in the similitude of the bills issued by," &c. The first construction would not require the existence of any bank; the latter would imply the necessity of its existence. This being a criminal statute, we adopt the latter, as the more limited construction And to this construction the information conforms.

It is clear that where the charge is for uttering and passing, the bank must be described as an "incorporated banking company." The same is true also of having in possession ten or more counterfeit bills, under section five, as well as for falsely making counterfeiting, &c., under section four.

But as to the offense of bringing into this state or having in possession with intent to utter, &c., under section eight, it would be sufficient to describe the bank as " established" in the places mentioned, without averring it to be incorporated.

Section ten of the same chapter, after enumerating specifically all the foregoing offenses mentioned in sections 4, 5, 6 and 8, including the offense here in question, and dispensing with the evidence of the president and cashier, if out of the state or more than forty miles from the place of trial, and allowing the bills to be proved counterfeit by the testimony of any person acquainted with their signa-' tures, or who has knowledge of the difference in appearance of the true and counterfeit bills, then concludes with the following provision (inserted by amendment April 7th, 1851): "and the lawful existence of any bank out of this state shall be presumed upon evidence that such bank is actually engaged in the business of a bank" (for such I understand to be the operative words of the amendment, notwithstanding the discrepancy between the words declared by the prior portion of the act, to be inserted, and those actually

inserted in the section as amended. — See *Laws of* 1851, *pp.* 169, 170; *Constitution, Art.* 4, §25). Now, as the provision here quoted applies to this offense, and to the bank here in question, and it is quite apparent that its chief object was to dispense with the strict proof of the legal existence of incorporations which might be required at common law, its effect must be, we think, to dispense with all proof upon this point except that which shall be sufficient to show " that the bank is actually engaged in the business of a bank." Upon satisfactory evidence being given of this fact, the statute *presumes* the *lawful existence* of the bank, and no evidence need be given touching the legality of its existence.

The Recorder charged the jury that, in order to convict, they must be satisfied from the testimony that said Agricultural Bank existed. But that general reputation in the community of its existence, and the fact that its bills were passing current from hand to hand in the business transactions of the day, were sufficient evidence of the existence of the bank, for the consideration of the jury; and if they were satisfied from such testimony that there was such a bank as the Agricultural Bank, it would be sufficient evidence to establish that fact. To this charge the defendant excepted.

It will be noticed here, that the only fact in controversy, so far as this exception is concerned, was whether there was *de facto* a bank "engaged in the business of a bank;" and if the evidence in question showing the circulation of its bills as current in the community, and the reputation of its existence, was *admissible at all* as tending to show this fact, then its weight was for the jury; and the charge of the Recorder was correct. The whole question then is reduced to that of its admissibility, as tending to show this fact.

It is to be recollected that no court in the state has the power to compel the attendance of witnesses from another state, or to take their deposition in a criminal case, unless

the defendant takes a commission for that purpose. It is for this reason, and to avoid the necessity of calling witnesses from a distance, even within the state, that this statute has dispensed with strict proof upon the question whether the bill is genuine or counterfeit; a point upon which there is much greater liability of erring to the defendant's prejudice. And unless such testimony as was here adduced can be admitted, the conviction of knaves and counterfeiters will, in many cases, be rendered impossible.

This consideration must not, it is true, be carried so far as to admit testimony unsatisfactory in its nature, or which may be calculated, from its uncertainty, to endanger the innocent. But we can see no reasonable apprehension of danger, nor any substantial liability to error, from the admission of testimony of the character here in question. It is the same evidence upon which every man relies in the ordinary business transactions of life; upon the faith of which he parts with his property, and trusts with confidence his most important pecuniary interests. There is no subject upon which business men, and especially bankers and brokers, are likely to be so well informed. Their own pecuniary interests compel the most eager and rigid scrutiny, without which they could not safely transact business for a single day. The thermometer is not more sensitive to changes of temperature than the public mind to every thing and to every rumor which is calculated to depreciate the credit of the bills which circulate in the community as money; and nothing, certainly, could tend more to depreciate the credit of such bills than the fact that they were not issued by any institution or association doing business *de facto*.

So general and so intimate are the business relations of the people, at least through all of the states north of the Ohio, and east of the Mississippi, and such are the facilities for the transmission of intelligence by railroad and the electric telegraph, that an imposition of this kind

would not be likely to succeed for forty-eight hours without being detected, at all the great commercial points at least.

We think, therefore, the evidence given in this case, showing the general circulation of the bills of this bank as money, and the reputation of its existence, was clearly admissible; that such evidence raises a strong, even a violent presumption of the existence of such an institution *de facto*, and that it was engaged in the business of a bank; that if less direct, yet, coming from several witnesses, it is even more satisfactory than the testimony of a single witness who might have been at the bank and seen them issue and redeem bills. And taking into consideration the extreme improbability that any one will counterfeit the bills of a fictitious institution, or of one not "engaged in the business of a bank," or that he would attempt to pass *such counterfeit* bills, knowing them to be such, we can see no reasonable apprehension of danger from such testimony.

The conclusion at which we have arrived will be found fully sustained by the following cases: *Johnson v. People*, 4 *Denio*, 364; *Sasser v. State*, 13 *Ohio*, 486; and *Reed v. State*, 15 *Ohio*, 217. See also as bearing less directly upon the question, but as throwing light upon it, — *People v. Caryl*, 12 *Wend.* 547; *People v. Chadwick*, 2 *Park. Cr. R.* 163; *People v. Davis*, 21 *Wend.* 309.

Several of the cases cited by the counsel for plaintiff in error against this conclusion, when carefully considered with reference to the difference between the statutes affecting them and our own statute, will be found very strongly to confirm it. See especially *State v. Carr*, 5 *N. H.* 367. And none of the cases in the United States, cited by the plaintiff in error, when considered with reference to our statute, will be found to conflict with that conclusion.

No error appearing in the record, the judgment of the Recorder's Court must be affirmed.

The other Justices concurred.